OPINION OF THE COURT
Shirley R Levittan, J.
The issue before the court is whether, after arrest without indictment, a delay in arraignment resulting primarily from a procedure recently employed in the Criminal Court of the City of • New York for the budgetary convenience of that city’s fiscally embarrassed police department, known as "pre-arraignment,” constitutes "unnecessary” delay within the meaning of CPL 120.90, 140.20 which mandate arraignment "without unnecessary delay,” when during such delay the accused, absent counsel, which he waived during the period of delay, makes inculpatory statements.
THE LEGAL BACKGROUND
Although after indictment an accused must be arraigned within a reasonable time (CPL 210.10; People v Jones, 56 Misc 2d 884), the rule is more stringent following arrest without indictment, requiring arraignment "without unnecessary delay” (CPL 120.90, 140.20; People v Jones, supra). However, violation of that right does not warrant dismissal of the indictment if no facts are shown establishing that during the period of unnecessary delay there has been no loss or diminution of or any prejudice to any rights of the defendant, id., such as, for example, extraction of a confession or admissions from the defendant (or, perhaps, an attempt at such extraction), or coercion or threat during detention (People v McCray, 63 Misc 2d 803; People v Johnson, 63 Misc 2d 800).
*787 While there is the aforesaid distinction between the permissible duration of delay awaiting arraignment after indictment on the one hand, or arrest without indictment on the other hand, that distinction has no reference to the quality of such rights as the accused may have while awaiting arraignment, such as freedom from interrogation without counsel where the right to counsel had not been waived. He has that right whether after indictment (Spano v New York, 360 US 315, revg 4 NY2d 256; People v Di Biasi, 7 NY2d 544), or after arraignment following arrest but not indictment, since arraignment after arrest must be deemed the first stage of a criminal proceeding (People v Meyer, 11 NY2d 162; People v Weston, 41 AD2d 423), or in the courthouse prior to such arraignment when it was "imminent,” "about to take place” and "while waiting for their cases to be called” (People v Richardson, 25 AD2d 221), or whether the arraignment is delayed for the specific purpose of generating sufficient time to elicit an exculpatory statement or continue or complete it if commenced prior to the period of delay, whether in the courthouse (People v Turchiarelli, 26 AD2d 898), or even during custody in police headquarters after booking on the police blotter, the proceeding having passed the investigatory stage and having reached the accusatory level (People v Veitch, 26 AD2d 764).
Clearly, delay of arraignment for no other purpose than to gain time to procure inculpatory statements in the absence of unwaived counsel, is "unnecessary” delay (People v Veitch, supra; see, also, United States v Middleton, 344 F2d 78; United States v Klapholz, 230 F2d 494; McFarlane v United States, 231 F Supp 191). While in Veitch (supra) the arraignment was delayed in order to gain time to procure the statement, in Turchiarelli (supra), the defendant at least commenced the statement during a necessary period of delay in the town hall attributable to an innocent cause, namely, time awaiting arrival of the Justice, but during the course of the statements he was taken to the police station where interrogation was continued, and he was not arraigned until after it was completed; and the statement was suppressed.
In the prosecution at bar there is no doubt that oral inculpatory statements were made by the accused to the Assistant District Attorney, reduced to writing by the Assistant District Attorney, and signed by the accused in the courthouse, more than 21 hours after arrest, prior to arraign *788 ment, and after the defendant had signed his name to a printed form of Miranda warnings containing what fairly may be construed as a literal waiver of counsel handwritten by the Assistant District Attorney for the purposes of interrogation prior to arraignment. There remains the issue whether, notwithstanding the literal waiver of counsel, both the waiver and the confession are vulnerable to suppression because procured during a period of unnecessary delay in arraignment, retarded either intentionally in order to procure the confession, or as a result of the "pre-arraignment” procedure. It is the defendant’s argument that neither the confession nor the waiver of counsel would or could have occurred if the defendant had been arraigned without unnecessary delay; that at first the "pre-arraignment” procedure generated the time and opportunity for the waiver and confession; and that the prosecutor took advantage of that delay to protract it further in order to utilize it to extract the confession.
The court supposes that the prosecutor may have delayed the arraignment by conducting the interrogation, in which case he may have done so knowingly or intentionally, but that these possibilities are too obscure to enable the court to find whether the prosecutor did, in fact, delay the arraignment, or whether, if he did, he did so intentionally. The reason for the obscurity is that the arraignment might, in any event, have been delayed beyond the period of interrogation even if the latter had not occurred, so that, regardless of the prosecutor’s intent, the interrogation would not have been the cause of the delay. In fact, the arraignment did not occur until about another 27 V2 hours after the interrogation was completed, but also could conceivably have occurred during the period of interrogation if the defendant had not been removed from the courtroom detention "pen” for the purpose of the interrogation. Confronted with this obscurity, the court cannot avoid consideration of the issue whether "pre-arraignment” contributed unnecessary delay without which the waiver of counsel and confession could not have occurred; and, if so, whether the confession is suppressible by reason of a courthouse procedure tolerated by the court itself.
PREARRAIGNMENT
The budgetary malnutrition and personnel reduction afflicting the New York City Police Department have con *789 strained it, understandably, to improvise apparent efficiencies. One conspicuous opportunity is the appearance of the typical arraignment courtroom densely populated with uniformed police officers and plainclothes police or detectives, badges displayed, languishing in the congestion of the arraignment calendar. With managerial technique that might be admired in private industry, the department has sought to eliminate the waste by concentrating the process into a bureaucratic crucible. The arresting or complaining officer, instead of waiting with his prisoner for actual arraignment, delegates the task to a surrogate police officer who so acts for a clientele of them, much as do the familiar attorneys’ representative service companies in the city’s civil court calendar parts, who relieve busy practicing lawyers from attendance and delay at congested motion and trial calendars. In the process a transfer of information is required, with necessary abbreviation and substantive loss in the translation. Something else is lost.
Although the arresting officer is the defendant’s adversary, the law has increasingly imposed upon him matching obligation to safeguard the defendant’s rights, e.g., Miranda. The arresting or complaining officer’s presence throughout the arraignment has, at least, one such protective consequence. It signals visually and conspicuously the corresponding presence of the defendant in detention, attracting attention to his very existence there. The officer has an interest in completing the defendant’s arraignment process in order to complete his own involvement in it, and that interest supplements the defendant’s protection. Absent such attendance and attention, the hazard that the detained prisoner may be lost in the bureaucratic apparatus is real (cf. People v McCray, 63 Mise 2d 803, supra; People v Johnson, 63 Mise 2d 800, supra), with the opportunity for mischief presaged in those cases and materialized in the one at bar. The price of police efficiency is paid by the dilution of judicial control and safeguards. The issue is not whether the entire arraignment system as a whole suffers. In the aggregate, gains and losses may or may not quantitatively offset each other arriving at a net balance. The issue is rather whether the losses are qualitatively justifiable by the gains. The issue is the individual defendant, not the system. An individual prisoner who suffers the loss has not been given his due by society on the theory that someone else has enjoyed a matching gain. The object of the criminal judicial system is to guarantee the rights of both the individual defendant and the *790 collective People. The former may not be sacrificed for the convenience of the latter.
Anglo-American criminal procedure is a system of justice evolved over centuries from origins rooted in a fundamental philosophy processed from experience in our political and social ascent from historical tyrannies. It is a corporal part of our social contract covenanted by the Constitution. Subject to the Constitution, its organization is the function of the Legislature, and, in part, the judiciary. The instrumentalities by which the latter have regulated it are a succession of codes of which the present incarnations are the CPL and court rules. Those codes and their antecedents are the formulae of continuous historical evaluation and evolution to synthesize practice with ideology. The function is legislative and partly judicial, but not executive or administrative. Executive fiat is the historical evil overcome by constitutional compact.
The court finds that the prearraignment procedure, formulated by the police department, is a procedure not properly adopted by the Legislature or judiciary and not analyzed in the laboratories of the Legislature and judicial processes. It has been engrafted onto the tissue of the CPL to which it is a foreign body. It is a growth upon the arraignment procedure, without benefit of the latter’s immunological safeguards. It must be viewed by the court as part of the arraignment process itself, where, however, it is suprious and not the equivalent of actual arraignment (CPL 1.20, subd 9; 110.10). Not sanctioned by the Legislature or court, it must a priori be deemed unnecessary as a matter of law, notwithstanding its convenience to the police system. Delay during its course must be deemed unnecessary delay. The prefix "pre” must be precluded lest it predispose prejudice. In the case at bar, during the unregulated hiatus of prearraignment, such prejudice occurred.
The defendant here was arrested on April 10, 1979 at 4:05 in the afternoon on suspicion of robbery in the first degree (Penal Law, § 160.15), and criminal possession of a weapon in the second degree (Penal Law, § 265.03). He was not finally arraigned until April 12 at 5:21 p.m. — over 49 hours later.
THE CASE AT BAR
Arrested on April 10, the processing of his arrest was completed by about 3:00 a.m. of the morning following his apprehension, that is, April 11, and his prior arrest and *791 fingerprint records were received at 5:42 a.m., a reasonable and efficient use of police time in New York City. At 7:15 a.m., he arrived in court and was placed in a detention "pen” directly adjoining the daytime arraignment courtroom, known as Part AR-1, physically available for arraignment when court opened at 10:00 a.m. The Criminal Court of the City of New York conducts arraignments 15V2 hours daily from 9:30 a.m. until 1:00 a.m. (with an hour out for lunch and for dinner)— the only court in the county — if not the world — with such extended sessions. Why should anyone in Manhattan have to wait over two days to be arraigned?
At about 10:50 a.m. Assistant District Attorney Schachter who was present at the "early case assessment bureau” (ECAB) in the courthouse in connection with another prearraigned case, was asked by his supervisor to handle this case. Between then and about 2:00 p.m. — but probably before noon —he and the arresting officer, Patrolman Steck, reviewed evidence on this case. Assistant District Attorney Schachter evaluated it, drafted a complaint, sent it to a typist, the typewritten complaint to be later signed by Patrolman Steck. Mr. Schachter also instructed the ECAB clerk that this case would be "prearraigned”. He testified that all cases which the People intend to present to a Grand Jury are prearraigned since no plea offers are made on arraignment. The court is aware that prostitution cases are also prearraigned. Mr. Schachter then proceeded to handle his other prearraigned case before a Grand Jury. He testified that the complaint at bar was not typed until 5:00 p.m. that evening, attributing the delay to the ordinary flow of paper work, and not knowing whether Officer Steck remained on the scene during the delay, although he signed the complaint. Mr. Schachter also testified that customarily the arresting officer leaves the courthouse after signing a complaint on a prearraigned case and a "prearraignment officer” is assigned to it. He also testified that on that day 15 prearraignment cases were processed at ECAB, not one of which reached arraignment that day, the earliest being reached the following morning between 10:00 and 11:00 a.m. The court knows that a prearraigned defendant cannot be arraigned in the absence of the prearraignment officer. However, Mr. Schachter could not explain why the 15 prearraignment cases processed by the ECAB on the 11th, including this one, could not be reached for arraignment that day. Mr. Schachter stated that the pressure of his other case precluded *792 any opportunity to interview the defendant in this case on that day, but that if Officer Steck had told him that the defendant had wanted to speak to the Assistant District Attorney, Mr. Schachter would have so notified his supervisor to arrange a designation of another assistant to interview the defendant.
The court has examined its records and finds that there were 67 cases on the daytime calendar of AR-1 between its opening and 4:40 p.m., of which 35 were arraigned and the remainder deferred for various customary reasons. Those numbers are not excessive, and 15 more would have been well within the court’s ability to arraign, if ready for it. The failure to arraign the 15 prearraignment cases processed by the ECAB on April 11 at the daytime AR-1 part, including this one, cannot be ascribed to the court or to calendar congestion. Nonetheless, the defendant was not called for arraignment then, his complaint not having been typed by then. He was held for the nighttime arraignment part, AR-3, on the calendar of which, containing 81 cases including 15 prearraignments, his name is typed directly below that of his codefendant and of the defendant of Mr. Schachter’s other prearraigned case. Neither was reached that night of April 11 and they were reassigned to AR-1 for the following day, April 12, on the calendar of which containing 68 cases, of which 41 were prearraignment, they appear in the same sequence. The calendar shows that a clerk noted asterisks next to 13 prearraignments on it with the footnote: "Only 1 pre-arraignment officer in AR-1. All defendants were put in holding pens by pre-arraignment officer at the same time (approx. 11:00 a.m.). Informed Judge.” At 5:21 p.m. this defendant was arraigned. He had been available since 9:30 a.m. the preceding day. Since the arraignment parts were closed between 5:00 p.m. and 6:00 p.m. and between 1:00 a.m. and 9:30 a.m., he was theoretically available in the pens adjoining the courtrooms an aggregate of some 20 actual working court hours awaiting arraignment. The word, "theoretical” is used because of the casualty which befell him during that time.
At 1:00 p.m., the defendant was in the detention pen in the custody of the Department of Correction, directly behind the Judge’s bench in courtroom AR-1, awaiting arraignment. In order for prisoners to be arraigned, they are brought from the pen into the courtroom through a door a few feet to the left and the rear of the Judge’s bench and are escorted around the *793 bench to face the Judge. That time, 1:00 p.m., was approximately simultaneous with or immediately after arraignment of another prisoner at 12:59 p.m., after which there apparently was a lunch recess. At the time, Assistant District Attorney Schachter was apparently preoccupied through lunch time (which he did not take) with his other case; Officer Steck was apparently not in the courtroom; the prearraignment officer is not accounted for; and the complaint against this defendant was waiting to be typed. In the meantime, another police officer, Detective Johnson, who was not connected with this case, had learned that the defendant was in the pen, and that his alleged accomplice had been a certain person who was a fugitive sought by Detective Johnson in connection with a different crime, a homicide which was being handled by the detective. Detective Johnson disclosed this fact to the Assistant District Attorney handling the homicide, who was also not connected with this case. The detective and that Assistant District Attorney went to the AR-1 courtroom. While the Assistant District Attorney waited behind the spectator rail, the detective walked through it, past the Judge’s bench, through the pen door to the Judge’s left, and in a few minutes emerged with the handcuffed defendant, past the bench, through the rail directly in front of the bench, and out of the courtroom. No permission was sought from or given by the Judge presiding who was right there.
The detective, the Assistant District Attorney handling the homicide and the defendant proceeded up a stairway to the second floor complaint room of the District Attorney’s office, closed the door behind them, and interrogated the defendant. Although their ostensible purpose was to elicit information about the fugitive from the unrelated homicide, the Assistant District Attorney read the defendant the four Miranda warnings from a printed form containing an additional statement, numbered 4-Vz, that he would get a Legal. Aid lawyer today for his arraignment, each warning and the additional statement followed by the question, "Do you understand?” and the handwritten answer, "Yes.” Then came Item "5) Having been advised of your rights, are you willing to tell me the truth at this time, without a laywer?” followed by the handwritten answer, "I’ll tell you now what you want to know.” The handwriting was the Assistant District Attorney’s, but the form was signed by the defendant. Then, rather than start with interrogation about the fugitive, the Assistant District *794 Attorney interrogated the defendant about the alleged robbery in this case, to which he was not assigned, and received an oral and written confession; after which the defendant was interrogated about the fugitive (about whom he said nothing).
CPL 1.20 (subd 9) provides: "9. 'Arraignment’ means the occasion upon which a defendant against whom an accusatory instrument has been filed appears before the court in which the criminal action is pending for the purpose of having such court acquire and exercise control over his person with respect to such accusatory instrument and of setting the course of further proceedings in the action.”
The court holds that the only purpose for which the defendant was in the detention pen directly behind the Judge’s bench in arraignment part AR-1 was arraignment, that the pen was, as it were, an extension of that courtroom itself; that the defendant’s presence there was part of the arraignment process, and the first stage of a criminal judicial proceeding (People v Meyer, 11 NY2d 162, supra; People v Weston, 41 AD2d 423, supra). In so holding, the court is undeterred by the fact that the accusatory instrument was still in the typing process. The Assistant District Attorney’s preparation of it in his own handwriting was complete and the arresting officer had already determined to sign it, so that the typing was a mechanical function which did not suspend the defendant’s presence in the extended courtroom for arraignment. The defendant’s right to counsel had already attached and could not be waived thereafter in the absence of counsel; and interrogation of the accused in the absence of his attorney would be impermissible (People v Weston, supra). The first obligation of the judicial system, once the accused was in the courtroom for arraignment, was to inquire whether the accused already had or wanted counsel. That obligation arises in the arraignment courtroom no later than the time when the accused is physically conducted before the bench. Here — if not before — when the accused was escorted through the door connecting the pen and the courtroom proper and conducted as far as the bench, it was the system’s duty to defer no further the opportunity of the accused to exercise his right to counsel. The People defeated that right by surreptitiously asporting the accused past the bench without halt for exercise of his said right, of which they thereby deprived him. The detective and the Assistant District Attorney exploited the fact that the personnel of the police, prosecutorial and judicial *795 systems were as yet unpositioned for formal arraignment because of the absence of the arresting officer, prearraignment officer, and the typewritten accusatory instrument, and that the accused was under the surveillance of none of those persons other than personnel of the Department of Correction.
Fault for the mishap is shared by the absence of each of these persons responsible for his function in the process. It serves no purpose to admeasure any apportionment of the blame as though this were a negligence action, and no contribution to it can be disregarded. The failure contributed by the prearraignment process can accordingly not be overlooked. Whether as much as, or more than, or less than, any other cause, the prearraignment process had also defaulted, leaving the accused exposed to the exploitation.
The court itself could have accommodated this defendant’s arraignment prior to the mishap at 1:00 p.m. of April 11. Even though the mishap occurred relatively early in the criminal proceeding, some delay must, under the facts of this case, be attributed to prearraignment. The very fact that it was designed to relieve the arresting officer of the necessity to remain on the scene while the proceeding was being processed, including the typing of the accusatory instrument for the signature of which he subsequently appeared, facilitated and encouraged distension of the process. Prearraignment was an ingredient emulsified indistinguishably in all passage of time. The delay ascribable to prearraignment must be held to be "unnecessary” because the procedure itself is unauthorized. It contributed unnecessary delay in formal arraignment during which time the defendant suffered prejudice.
The confession is suppressed.